# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Harmony Township,                                   :
                          Petitioner                :
                    v.                              :     No. 1019 C.D. 2018
                                                    :     Argued: February 11, 2019
Unemployment Compensation                           :
Board of Review,                                    :
                          Respondent                :


BEFORE:     HONORABLE RENÉE COHN JUBELIRER, Judge
            HONORABLE ROBERT SIMPSON, Judge
            HONORABLE P. KEVIN BROBSON, Judge


**OPINION NOT REPORTED**


**MEMORANDUM OPINION BY**
**JUDGE COHN JUBELIRER**                    **FILED: March 4, 2019**


Harmony Township (Employer or Township) petitions for review of a June 26, 2018 Order of the Unemployment Compensation (UC) Board of Review (Board) that reversed a Referee's Decision that found Tinamarie Spragg (Claimant) ineligible for UC benefits pursuant to Section 402(b) of the UC Law (Law), 43 P.S. § 802(b).[1] On appeal, Employer argues that the Board erred in finding Claimant not ineligible because: it erred in crediting Claimant's testimony based solely on the fact that Employer did not present any contradictory testimony; 5 of the Board's 65

---

[1] Act of December 5, 1936, Second Ex. Sess., P.L. (1937) 2897, *as amended*, 43 P.S. § 802(b) (providing that an employee shall be ineligible for UC benefits "for any week [i]n which h[er] unemployment is due to voluntarily leaving work without cause of a necessitous and compelling nature").

findings of fact were not supported by substantial evidence or did not support the Board's determination; and Claimant was not subject to intolerable working conditions constituting a necessitous and compelling reason for voluntarily quitting her employment. After review, we affirm the Board's Order.

## I. Factual and Procedural Background

Claimant worked for Employer beginning on April 4, 2016, as the Township Secretary and Financial Administrator (Township Secretary). On January 2, 2018, Employer reorganized by eliminating the Township Secretary position and appointing Claimant Township Manager. On January 22, 2018, Claimant sent an email to Employer's Solicitor and Auditor, complaining about allegedly intolerable working conditions at her employment and stating that she was refusing to return "to work and deal with what [she] ha[d] endured any longer." (Reproduced Record (R.R.) at 291.) On January 25, 2018, Solicitor notified Claimant by certified letter that he had concluded that Claimant had abandoned her employment by sending the email and not reporting to work.

Claimant filed a claim for UC benefits. In response to a questionnaire from the UC Service Center, Claimant attached over 80 pages of documents, including a number of emails, in support of her claims that: she had been subject to harassment, discrimination, and intimidation in the workplace; she had reported these problems to, among others, Employer's Board of Commissioners and Solicitor; and Employer took no corrective action. By Notice of Determination, the UC Service Center notified Claimant she was not ineligible for benefits. Employer appealed, and a hearing was held before the Referee.

2

## A. Referee's Hearing

Although Employer appeared with two witnesses, including the Chairman of Township's Board of Commissioners (Chairman), Claimant was the only witness who testified. Both Claimant and Employer presented documentary evidence.

Claimant testified regarding her work duties, her interactions with other Township employees and her supervisors, and the events that led up to her January 22, 2018 email. When Claimant first started, a Commissioner asked her to report any misconduct she observed, which she did. For example, while preparing Employer's 2017 budget in October 2016, she discovered that the Sewage Department had not collected $66,000 in sewage rental fees, and she reported the delinquent sewage fees to the Chairman. Ultimately, Claimant's report led to Employer engaging its Auditor to audit the Sewage Department, and Auditor prepared a report to the Commissioners that, according to Claimant, did not place Administrative Assistant for the Sewage Department "in a positive light." (*Id.* at 138-39.) Claimant testified that the audit found substantial improprieties such as "deleted sewage accounts[,] . . . deletion errors and [that] adjustments [were] made to it," and the adjustments totaled $54,000. (*Id.* at 168.) Claimant noted that during the course of the investigation into the Sewage Department, she told Solicitor that Administrative Assistant had once told Claimant that it would not be difficult for Administrative Assistant to steal money from Employer, and that Administrative Assistant had acknowledged forging a document so that she could claim lost time from work due to a car accident when, in fact, Administrative Assistant did not miss any work.

Claimant testified that she also had reported Road Department Foreman (Road Foreman) for conduct that she believed was fraudulent. For example, Road Foreman

3

used Employer's credit card to order earmuffs for shooting, which he had sent to his home address. After Administrative Assistant advised Road Foreman that Claimant was questioning the purchase, Road Foreman told Claimant that he was just replacing something he gave to Employer. Claimant reported Road Foreman to the Chairman, and he responded "that was not good," but Chairman did nothing about it. (*Id.*) Claimant also reported Road Foreman for ordering cold patch from a vendor that he, again, had sent to his home address. Road Foreman told Claimant not to pay for the cold patch because it was just a sample, but after discussing the matter with the vendor, the vendor advised Claimant that it had recorded Road Foreman and "he was lying." (*Id.*) This recording was forwarded to the Commissioner responsible for the Road Department (Road Commissioner). (*Id.* at 134.) Claimant reported Road Foreman to Road Commissioner, but nothing happened to Road Foreman. Another time, Claimant recounted, Road Foreman placed his signature on a check in lieu of one of the three signatures required to be on the check, and Road Foreman commented to Claimant, "we'll see . . . what the auditor will have to say about that." (*Id.*) Claimant reported this event to the Chairman, who responded that this was not good, but, again, did nothing to discipline Road Foreman.

At the end of July 2017, Claimant discovered, with the assistance of Tax Collector, that Road Department employees were claiming entitlement to overtime pay. Claimant explained that while reviewing payroll for the Road Department with Tax Collector, Tax Collector noticed that the employees were claiming overtime in a week where the employees took a vacation day. Tax Collector explained to Claimant that employees had to work 40 hours first, before they could be eligible for overtime, and a vacation day did not count toward the 40 hours. Claimant was unaware of this rule and contacted the Auditor and the Chairman. The Chairman

4

told Claimant that if the overtime had been "signed off on," then she should pay it. (*Id.* at 139.) Auditor, however, told Claimant in an email that overtime was not payable if the employee had used vacation, sick, or personal time. Auditor suggested that Claimant ask Solicitor for his input, which she twice did in October and again in November, and Solicitor ultimately agreed that overtime was not payable, as Auditor had indicated. When Claimant told Road Foreman about this rule, he responded that "he had been doing this for 28 years." (*Id.*)

In August 2017, Road Foreman's family members appeared at a Township meeting and questioned Claimant about whether Administrative Assistant had been paid for working one afternoon when she had left early. Two Commissioners inquired of Claimant, and she discovered, after speaking with another employee who was present that day, that Administrative Assistant had left work four hours early. When Claimant discussed the issue with Administrative Assistant, Administrative Assistant cursed at Claimant. Claimant reported the matter of Administrative Assistant stealing time to the Chairman, but he told Claimant that "he did not want anyone fired." (*Id.* at 136.)

As a result of Claimant's reports of misconduct, Claimant testified that Road Foreman and other employees began harassing and intimidating her. Road Foreman commented to Claimant that she had "a big mouth" and should "try shutting it once in a while." (*Id.* at 57.) Road Foreman also told Claimant to "watch it" or she was "going to be looking for [her] eighth job," and Claimant realized that her LinkedIn page showed she had seven prior jobs. (*Id.* at 58, 133.) In March 2017, when one police officer was discharged from his employment with Employer, Road Foreman commented that he hoped Claimant, who worked in the front of the building without a locked door, had "brought [her] bullet proof vest" for whenever the officer returned

5

to "shoot[] up the building." (*Id.* at 135, 244.) Road Foreman's comments made Claimant feel "uneasy and nervous." (*Id.* at 242.) Road Foreman repeated these comments, in June 2017, after Employer terminated a police sergeant. Claimant reported Road Foreman's comments to Solicitor in a July 19, 2017 email, and Solicitor responded in an email, "I would not fear retaliation." (*Id.* at 241.) Claimant also reported comments during an executive session with the Board of Commissioners. The following day, Road Commissioner emailed Claimant indicating that he had spoken with Road Foreman and the entire Road Department and that things were going to change. Claimant was concerned that Road Commissioner had spoken with the entire Road Department. Following the meeting, the Road Department employees retaliated against her by moving their time clock, refusing to deliver documents, and "just . . . completely ostraciz[ing]" Claimant. (*Id.* at 136.)

In September 2017, Claimant privately emailed Road Commissioner complaining about various ongoing issues with the Road Department and Road Commissioner, including his speaking with the entire Road Department about Road Foreman's comments to Claimant, and the Road Department ostracizing her. Claimant commented in the email that another employee told her that Road Commissioner had said that Claimant "better watch her back or she will be gone too." (*Id.* at 67.) Road Commissioner forwarded this email to the Board of Commissioners, and then scheduled a mandatory meeting with the Board of Commissioners and all of Employer's employees so that any grievances could be discussed. Claimant, however, along with the Chairman, another Commissioner, and the police department did not attend the meeting. Claimant explained she

6

"didn't want to be in a hostile situation," "to be the target," and then suffer retaliation. (*Id.* at 73, 160.)

In addition to reporting instances of financial misconduct that resulted in her being harassed, Claimant testified she reported instances of employees using discriminatory language. For example, she observed other employees using "racially charged language . . . about African Americans," and "talking about gays" as "disgusting and sickening." (*Id.* at 74, 180.) When she reported such comments to the Chairman, he responded, "we cannot control what people say." (*Id.* at 74.) Claimant also recounted instances of what she considered sexual discrimination, such as Road Foreman commenting that she should let her "breasts hang out," and a Commissioner asking if she enjoyed being handcuffed and telling a sexually explicit story. (*Id.* at 35-36.) Claimant also testified that Administrative Assistant once referred to her as "spritz," because Claimant puts hairspray in her hair. (*Id.* at 45.)

In December 2017, the Board of Commissioners voted to eliminate Claimant's position and appoint her as Township Manager. Claimant testified that she was "leery" of working as Township Manager because she was "going to [be] put . . . in charge of the very people who ha[d] been harassing [her]." (*Id.* at 141.) Claimant testified that she told Chairman she did not want to be Township Manager because Road Foreman would file grievances against her, but Chairman assured her that Road Foreman would not do so, and added that his "hands [were] tied" and he could do nothing about Road Foreman. (*Id.* at 166.) When she subsequently spoke to Chairman again about Road Foreman, Chairman "turned [Claimant's] fear around and used [it] against [her]," stating, "it is only a matter of time before he files grievances against you." (*Id.*)

7

Beginning on January 1, 2018, and continuing almost daily, Road Foreman started emailing Claimant with complaints. Up until that time, Road Foreman had emailed Claimant only once and to write, "okay." (*Id*. at 142.) On January 1, 2018, Road Foreman emailed Claimant, complaining that he had not been reimbursed for a $220.99 clothing allowance in his paycheck, and, on January 2, 2018, he inquired about pension checks for himself and another individual. Claimant addressed both of his inquiries. On January 3, 2018, Road Foreman emailed Claimant, stating it had been at least a year that the Road Department had been waiting for her to secure a license plate for Employer's tree chipping vehicle, and that he had instructed the Road Department not to use the vehicle until it was legally licensed. Claimant responded that Road Foreman had never previously brought the issue of licensing the tree chipping vehicle to her attention and directed him to send a single email detailing any other issues so that she could rectify them. Road Foreman emailed Claimant the next day disputing that he had never previously requested a license and, in fact, had requested licenses for several vehicles. Road Foreman wrote that Claimant might not recall, but she was "overwhelmed" with securing a plate for Employer's street sweeper, and that she "could not understand the concept of putting plates on the vehicle." (*Id.* at 141, 270.) Road Foreman stated that going forward he would communicate via email so that there were no misunderstandings, and that he was officially requesting plates for Employer's tree chipper, leaf machine, and a trailer. Claimant responded that Road Foreman's comments to her were offensive because they belittled her as a woman, that she was "emotional, stupid, and/or not smart." (*Id.* at 271.) Claimant asked Road Foreman to refrain from insulting her, noted that she had "endured many unfavorable comments" from him in 2017, and asked that they "start the New Year off on the right track." (*Id.*) The following

8

week, on Monday, January 8, 2018, after Claimant sent a memorandum regarding healthcare to all employees, Road Foreman emailed Claimant requesting the memorandum so that he could answer his employees' questions about it. The next day, Claimant forwarded all the emails she had received from Road Foreman to Solicitor, and Solicitor indicated to Claimant in a phone conversation that Road Foreman was harassing her. On January 11, 2018, Road Foreman emailed Claimant complaining about problems with Employer's phone system.

On January 12, 2018, Road Foreman emailed Claimant indicating that one of his employees (Road Employee) had not been paid 20.5 hours of overtime for the week of December 24. Claimant testified that she had missed a day of work because she was in a car accident, and, in her absence, Tax Collector processed the payroll, paying all the other Road Department employees for overtime except for Road Employee whose timesheet, which Road Foreman completed, did not include any overtime hours. Claimant knew, however, that none of the Road Department employees had worked 40 hours that week because Employer had given the employees the entire week of Christmas off. Claimant responded to Road Foreman in an email that Road Employee had not listed any overtime hours on his timesheet. Claimant reminded Road Foreman that, as Auditor stated, overtime was not to be paid "when there [we]re no hours worked for the week," and she told him to provide her with timecards showing otherwise. (*Id.* at 276.) On Friday, January 19, 2018, Claimant emailed Solicitor, copying Tax Collector, and several Commissioners, about the issue with paying Road Employee overtime. Solicitor responded that he would be in a seminar all day and would not be able to respond until next week, but, he wrote, as he had discussed with Claimant in the past, overtime was not to be paid if the employee did not work 40 hours in a week.

9

Nevertheless, Road Commissioner and Tax Collector both pressured Claimant to pay Road Employee the overtime. Tax Collector called Claimant, asking her to "just pay . . . [Road Employee] the overtime," and Claimant replied that she could not do so without proof that Road Employee worked overtime. (*Id.* at 147.) Meanwhile, Road Commissioner called Claimant, "pressur[ing]" her to pay Road Employee overtime, but Claimant told him she would not do so because she believed it would be illegal. (*Id.*) Road Commissioner replied that he needed Claimant "to do the same for [Road Employee] that was done for the other guys," and that "[Chairman] agrees with this too." (*Id.*) Claimant refused to issue the payment for Road Employee and told Road Commissioner to do so himself. After Claimant hung up the phone with Road Commissioner, she saw that Tax Collector had emailed her. Tax Collector wrote that she had reviewed "the FLSA[2] and also the PA guidelines" and that they did not exclude paying overtime under these circumstances. (*Id.* at 283.) Tax Collector added that while "we do not want this to be standard practice, and certainly as a government entity we do not want to pay more than is required from public funds on a regular basis," she thought it might "possibly be permissible for the [C]ommissioners to phone vote to be ratified at a later date that time and a half be paid for that particular pay week so this can be finalized once and for all[.]" (*Id.*) Claimant called Tax Collector and told her that for the Commissioners to vote over the phone would be illegal. Tax Collector continued to pressure Claimant to issue the payment to Road Employee, telling her that the "taxpayers would be all right with it" because "they are blue collar." (*Id.* at 149.) Over the weekend, Claimant reported the "payroll fraud and/or time theft that was occurring" to the Chairman, showing him a text message she had previously sent to another

_____

[2] Although not specified, the Tax Collector's reference appears to be the Fair Labor Standards Act of 1938, 29 U.S.C. §§ 201–219.

10

Commissioner.  (*Id.* at 149, 285-88.)  Claimant testified that she had discussed with the Chairman her various complaints many times, and his comment was "things are not going to get better . . . [t]hey are going to get worse."  (*Id.* at 163-64.)  January 19, 2018, Claimant testified, "was the last straw" for her.  (*Id*. at 149.)  She was "extremely upset," "completely drained of energy and so distressed."  (*Id.*)  Employer, Claimant testified, "would have to make some changes immediately for [her] to work there," but she knew that Employer would not do so.  (*Id.*)  Claimant explained that she reported these incidents because she feared that if she did not then, as the financial administrator, she "would be in trouble."  (*Id.* at 137-38.)

On Monday, January 22, 2018, Claimant emailed Solicitor and Auditor, reporting what had occurred on January 19 with the overtime issue, and that Road Foreman had repeatedly harassed, threatened, and belittled her.  (*Id*. at 291.)  Claimant also recounted in her email that one Commissioner had told her that he thought she "should quit because something really bad [wa]s going to happen."  (*Id.*)  Claimant stated she was "refusing to come to work and deal with what [she had] endured[,]" which Solicitor considered as Claimant having abandoned her position.  (*Id.*)

## B. Referee's Decision

The Referee concluded that Claimant failed to establish that she voluntarily left her employment for a necessitous and compelling reason.  (Referee's Decision at 3.)  The Referee reasoned that while Road Foreman's comments about discharged employees retaliating with violence were "childish," Claimant had no reason to believe that it would actually occur.  (*Id.*)  As for the issue surrounding payment of overtime to Road Employee, the insistence of Tax Collector and Road

11

Commissioner to pay the overtime was not abusive, and there was nothing to suggest that Claimant would be reprimanded in any way for refusing to issue payment. Further, while Claimant voiced her concern to Tax Collector about the propriety of performing a voice vote, there was no evidence to show that Claimant had been pressured into performing an illegal act. (*Id.*) The Referee noted that much of Claimant's complaints occurred months before she voluntarily left her employment, and because those actions did not appear to be ongoing, the Referee could not use them as a basis for finding that Claimant had a necessitous and compelling reason for quitting. (*Id.*) Although, the Referee stated, "[C]laimant's interactions may have been uncomfortable, . . . personality conflicts and procedural disagreements are not necessitous and compelling reasons" for quitting. (*Id.* at 3-4.) Thus, the Referee concluded, because Claimant had not shown she had a necessitous and compelling reason for quitting, she was ineligible for benefits.

Claimant appealed to the Board.

### C. The Board's Opinion

The Board issued its Opinion, making 65 findings of fact that recounted Claimant's account of the "retaliation and harassment" she experienced at work, which, the Board concluded, provided a necessitous and compelling reason for quitting her employment. (Board's Opinion (Op.) at 8.) In addition to those findings of fact, the Board also noted that it "accept[ed] the [C]laimant's testimony as credible, as the [E]mployer rested without calling its witnesses to offer contrary testimony." (*Id.* at 7.)

The Board explained that Claimant was subject to retaliation and harassment, primarily from Road Foreman and Administrative Assistant, which consisted of

threats or jokes about her continued employment and, in the case of Road Foreman, that former employees would shoot up the building. (*Id.* at 8.) Claimant, the Board noted, repeatedly reported these problems to Chairman, the Board of Commissioners, and Solicitor, but her reports were not properly handled. For example, the Board noted, the Chairman stated he did not want anyone fired, the Road Commissioner met with the entire Road Department about complaints that only involved Road Foreman, which led to the entire Road Department ostracizing Claimant, and, ultimately, Employer decided "to shift the problem" onto Claimant by putting her in charge of the very people who were harassing her. (*Id.*) "This retaliation, harassment, and lack of support came to a head on January 19," the Board stated, with the issue of paying Road Employee overtime, where Tax Collector and Road Commissioner pressured Claimant to pay Road Employee. (*Id.*) Under these circumstances, the Board concluded, Claimant had a necessitous and compelling reason for quitting her employment and, therefore, was not ineligible for benefits.

Employer now petitions this Court for review of the Board's Order.[3]

## II. Discussion

On appeal, Employer raises three arguments:[4] (1) the Board did not actually weigh Claimant's testimony, but found it credible simply because Employer did not offer any testimony; (2) five of the Board's findings of fact are not supported by substantial evidence; and (3) Claimant did not meet her burden of showing a

---

[3] We review the Board's Order for whether constitutional rights were violated, whether there was an error of law, and whether the Board's findings are supported by substantial evidence. *Brunswick Hotel & Conference Ctr., LLC v. Unemployment Comp. Bd. of Review*, 906 A.2d 657, 660 n.2 (Pa. Cmwlth. 2006).

[4] We have reordered Employer's arguments for ease of discussion.

13

necessitous and compelling reason for voluntarily terminating her employment. We address these issues *seriatim*.

1. Crediting of Claimant's Testimony

Highlighting the Board's statement that "the Board accepts the [C]laimant's testimony as credible, as the [E]mployer rested without calling its witnesses to offer contrary testimony," Employer argues that the Board accepted Claimant's testimony as credible solely because Employer did not present any testimony from its own witnesses. (Employer's Brief (Br.) at 9-10 (quoting Board Op. at 7).) This was error, Employer asserts, because the Board may reject even uncontradicted testimony if it is not credible. Therefore, Employer contends, the Board did not really weigh the credibility of Claimant's testimony or resolve conflicts in the evidence. Since the Board did not do so, Employer argues that the Board's determination must be reversed.

Claimant argues that the Board did weigh her testimony and documentary evidence, accepted that testimony and evidence as credible, and made detailed findings of fact based on that credited evidence. Claimant acknowledges that the Board did comment on Employer's failure to present any witnesses, while noting that the Board never stated that it was **bound** to accept Claimant's testimony for that reason. Claimant contends the Board was merely citing the lack of contrary evidence, which made Claimant all the more credible.

In UC proceedings, it is the Board that is the ultimate finder of fact. *Chapman v. Unemployment Comp. Bd. of Review*, 20 A.3d 603, 607 (Pa. Cmwlth. 2011). As such, the Board determines the weight and credibility of the evidence and is free to accept or reject a witness's testimony regardless of whether it is corroborated and

14

even if it is uncontradicted. *Id.*; *Daniels v. Unemployment Comp. Bd. of Review*, 755 A.2d 729, 731 (Pa. Cmwlth. 2000).

Here, Employer relies on a single sentence in the Board's Opinion that it "accept[ed] the [C]laimant's testimony as credible, as the [E]mployer rested without calling its witnesses to offer contrary testimony." (Board Op. at 7.) Employer argues this shows the Board accepted Claimant's testimony only because Employer did not present any of its own testimonial evidence. However, the Board made 65 findings of fact, based not only on Claimant's uncontradicted testimony, but also the many emails Claimant authored and the responsive emails of her co-workers, supervisors, and other representatives of Employer, including Solicitor. Those emails corroborated Claimant's testimony that, for example, Administrative Assistant was not collecting delinquent sewage rental fees, that Road Foreman had commented that Claimant should wear a bulletproof vest to work because two former employees might shoot up the building, that Road Foreman had lied about ordering cold patch from a vendor for his own personal use, and that Tax Collector and Road Commissioner pressured her to issue payment of overtime that was not permitted. Under these circumstances, we conclude that, contrary to Employer's contention, the Board did weigh Claimant's testimony and the documentary evidence supporting her testimony, along with the documentary evidence and lack of testimony from Employer, and found that Claimant's testimony was credible as it is authorized to do as fact finder. *On Line Inc. v. Unemployment Comp. Bd. of Review*, 941 A.2d 786, 791 (Pa. Cmwlth. 2008) (noting that certain testimony "was uncontradicted and accepted by the Board as credible"). Accordingly, we discern no error in the Board's credibility determination.

Employer's Challenges to Findings of Fact 9, 19, 24, 25, and 37

Next, Employer argues that findings of fact 9, 19, 24, 25, and 37 are either not supported by substantial evidence or do not support the Board's determination that Claimant was subject to intolerable working conditions. Employer argues that these unsupported findings of fact were "crucial" to the Board's determination and, therefore, the Board's Order must be reversed. (Employer's Br. at 15.)

Substantial evidence means "relevant evidence upon which a reasonable mind could base a conclusion." *Sanders v. Unemployment Comp. Bd. of Review*, 739 A.2d 616, 618 (Pa. Cmwlth. 1999). In determining whether there is substantial evidence to support the findings of the Board, we must view the evidence, including all reasonable and logical inferences that can be drawn therefrom, in the light most favorable to Claimant, as the prevailing party. *Id.* Our substantial evidence analysis proceeds from a review of the record as a whole. *Rodriguez v. Unemployment Comp. Bd. of Review*, 174 A.3d 1158, 1163 (Pa. Cmwlth. 2017). So long as the record, when viewed as a whole, contains substantial evidence to support the Board's findings of fact, they are conclusive on appeal. *Id.* Thus, even if there is evidence in the record that supports a contrary conclusion, it does not follow that the Board's findings of fact are not supported by substantial evidence. *Johnson v. Unemployment Comp. Bd. of Review*, 504 A.2d 989, 990 (Pa. Cmwlth. 1986). Applying these principles of law, we conclude that each of the challenged findings of fact is supported by substantial evidence and support the Board's determination that Claimant was subject to intolerable working conditions.

Finding of Fact 9 states:

> 9. The audit report identified substantial improprieties, consisting of deleted revenue accounts, deletion errors, and improper

adjustments totaling $54,000. This report cast [Administrative Assistant] in an unfavorable light.

(Board's Op., Findings of Fact (FOF) ¶ 9.) Employer contends that finding of fact 9 is not supported by substantial evidence because an email from Auditor indicated the $54,000 reflected in the reports as improper adjustments was misleading and incorrect. Claimant argues that finding of fact 9 is supported by her own testimony, and that what Employer seeks to do is reweigh conflicting evidence in the record, which this Court may not do.

As Claimant correctly contends, finding of fact 9 is supported by Claimant's own testimony that the audit of the Sewage Department found substantial improprieties such as "deleted sewage accounts[,] . . . deletion errors and [that] adjustments [were] made to it," and the adjustments totaled $54,000. (R.R. at 168.) While Employer points to an email from Auditor that the "$54,000 number . . . is misleading," (*id.* at 254), it was for the Board, and not this Court, to resolve any conflicts in the evidence. *Serrano v. Unemployment Comp. Bd. of Review*, 149 A.3d 435, 439 (Pa. Cmwlth. 2016). Thus, finding of fact 9 is supported by substantial evidence.

Finding of fact 19 states:

> 19. [Road Foreman] and [Administrative Assistant] joked or made threats about the [C]laimant losing her job throughout the [C]laimant's tenure with the [E]mployer.

(FOF ¶ 19.) Employer argues that finding of fact 19 is not supported by substantial evidence because neither Road Foreman nor Administrative Assistant were Claimant's supervisors, and, therefore, were not in a position to affect Claimant's employment. Claimant argues that the record established that Road Foreman and Administrative Assistant, while not Claimant's superiors, "had the support, or at

17

least acquiescence, of some of the [C]ommissioners, who did have the authority" to affect Claimant's employment. (Claimant's Br. at 13.)

Although, as Employer argues, Road Foreman and Administrative Assistant could not discipline or fire Claimant, it is evident that their comments, such as that Claimant would be "looking for [her] eighth job" if she did not "watch it," were designed to intimidate her into quitting her employment. (R.R. at 58, 133.) Further, viewing the evidence in the light most favorable to Claimant, as we must, since the Commissioners were unwilling to discipline Road Foreman or Administrative Assistant despite their misconduct, Claimant could conclude that they, as Road Foreman had expressed, could influence the Commissioners into terminating her employment. Thus, there is substantial evidence to support finding of fact 19.

Finding of fact 24 states:

> 24. [Road Foreman] and the [R]oad [D]epartment retaliated by removing and/or moving a time clock, refusing to deliver packets to the [C]ommissioners (which the [C]laimant and/or the police department then had to do), and completely ostracizing the [C]laimant.

(FOF ¶ 24.) Employer argues that finding of fact 24 is "belied by the record" because Claimant had "abundant communication" with the Road Department and, therefore, was not ostracized. (Employer's Br. at 14.) Claimant argues that she specifically testified that she was ostracized and that most of the communication she did have with the Road Department was harassing and abusive.

We note that Employer does not dispute that the Road Department removed a time clock and refused to deliver packets and that this was for the purpose of retaliating against Claimant. Rather, Employer argues only that Claimant was not completely ostracized by the Road Department. Claimant, however, specifically testified that the Road Department "completely ostracized" her and "just wouldn't

18

come around anymore." (R.R. at 136.) While Employer states that Claimant and the Road Department had "abundant communication," (Employer's Br. at 14), Employer points to nothing in the record to support such a conclusion. Rather, the record shows, as Claimant argues, that the communication she did have with the Road Department consisted of, for example, her being pressured to pay overtime that was not warranted. Thus, Employer has not shown that finding of fact 24 is not supported by substantial evidence.

Finding of fact 25 states:

> 25. At [a T]ownship meeting in August 2017, [Road Foreman's] family members questioned the [C]laimant about [Administrative Assistant] leaving work early and claiming hours she wasn't entitled to when the [C]laimant was on vacation – leading two [C]ommissioners to inquire of the [C]laimant about [Administrative Assistant's] hours. The [C]laimant informed [the Chairman] about the matter at his place of business; however, [the Chairman] told the [C]laimant he didn't want anyone fired.

(FOF ¶ 25.) Finding of fact 25, Employer asserts, is irrelevant because it does not prove or disprove harassment. Claimant does not specifically address finding of fact 25.

We conclude that finding of fact 25 is supported by Claimant's testimony and, contrary to Employer's contention, is not irrelevant. This finding tends to show that Claimant reported theft of time to the Chairman, and the Chairman took no action, stating that he did not want anyone fired. This shows that Claimant was subject to intolerable working conditions because certain employees could commit misconduct without fear of discipline from Employer, thereby leaving them free to harass Claimant without fear of repercussion. (R.R. at 136.) Thus, we will not disturb finding of fact 25.

19

Finding of fact 37 states:

> 37. The [C]laimant did not want to be [T]ownship [M]anager because [the Chairman] told her it would only be a matter of time before [Road Foreman] files grievances against her. She also had a problem retaliating against the people who retaliated against her. However, the [T]ownship eliminated her position as [T]ownship [S]ecretary, and she wouldn't have a job otherwise.

(FOF ¶ 37.) Employer argues that finding of fact 37 assumes that Claimant was promoted "in order to retaliate against her alleged harassers." (Employer's Br. at 14.) Claimant does not specifically address Employer's argument.

We disagree with Employer's characterization of finding of fact 37. The testimony in the record was that Claimant had "a problem with retaliating against people who ha[d] retaliated against [her]" because she was "not going to lower [her]self and write up people continuously when it was never handled" before. (R.R. at 170-71.) Moreover, Claimant feared that she was going to be accused of retaliation herself, which fear was legitimate, given the Chairman's statement that it was "only a matter of time before [Road Foreman] file[d] grievances against" Claimant. (*Id.* at 166.)

Therefore, we conclude that the challenged findings of fact are supported by substantial evidence and support the Board's determination that Claimant was subject to intolerable working conditions

### 3. Necessitous and Compelling Reason for Claimant's Voluntary Quit

Employer argues that Claimant acknowledged at the hearing that she did not quit because of Employer's alleged lack of financial oversight, but because of harassment, retaliation, and a hostile work environment. However, Employer contends, Claimant did not prove that she was harassed, retaliated against, or subject

20

to a hostile work environment. The comments Road Foreman made, such as that Claimant would be looking for her eighth job, were not threats, and Road Foreman had no control over Claimant's employment. Road Foreman's comment that she should wear a bulletproof vest to work, was "a joke," albeit "one made in poor taste." (Employer's Br. at 12.) Administrative Assistant's reference to Claimant as "spritz," (R.R. at 45), and her single use of profanity are not sufficient to rise to the level of harassment. Further, Employer asserts, these incidents occurred months before Claimant quit, and Employer attempted to hold a meeting to address these situations, but Claimant refused to attend. For these reasons, Employer claims, Claimant did not prove a necessitous and compelling reason for quitting.

Claimant argues that the Board correctly determined that she met her burden of proof establishing a necessitous and compelling reason for quitting and, thus, that determination should not be disturbed. The evidence presented, Claimant contends, showed that she was subject to intolerable working conditions. Claimant reported instances of fraud, by Road Foreman and Administrative Assistant, but no action was taken and, after each report, she was subject to retaliation, threats, and harassment at the hands of these, as well as other, employees. In addition, Claimant reported other instances of "stressful interactions and conflicts with other employees," which were her attempts to resolve these situations without resigning. (Claimant's Br. at 10.) While, Claimant acknowledges, Employer did call a meeting in September 2017, Claimant credibly testified that she felt unsafe attending a meeting with her harassers. Employer should have dealt with the situation, Claimant argues, rather than calling a meeting. Claimant asserts that she acted with ordinary common sense and took reasonable steps to preserve her employment, continuing to work even after many of these comments and threats. "It was only after the

21

[E]mployer failed to take any concrete steps to alleviate the misconduct," and Road Commissioner suggested she "go along" with paying overtime that was not warranted, that Claimant quit. (*Id.* at 14.) Under these circumstances, Claimant asserts, she showed she had a necessitous and compelling reason for quitting.

In a voluntary quit case, the claimant bears the burden of establishing a necessitous and compelling reason for quitting. *Craighead-Jenkins v. Unemployment Comp. Bd. of Review*, 796 A.2d 1031, 1033 (Pa. Cmwlth. 2002). In order to satisfy that burden, the claimant must show: "(1) circumstances existed which produced real and substantial pressure to terminate employment; (2) such circumstances would compel a reasonable person to act in the same manner; (3) the claimant acted with ordinary common sense; and (4) the claimant made a reasonable effort to preserve her employment." *Brunswick Hotel & Conference Ctr., LLC v. Unemployment Comp. Bd. of Review*, 906 A.2d 657, 660 (Pa. Cmwlth. 2006). Abusive conduct, unjust accusations, or profane language by another employee that creates an intolerable working atmosphere can constitute a necessitous and compelling reason for quitting. *Porco v. Unemployment Comp. Bd. of Review*, 828 A.2d 426, 428 (Pa. Cmwlth. 2003); *Karloff v. Unemployment Comp. Bd. of Review*, 531 A.2d 582, 584 (Pa. Cmwlth. 1987). A claimant also has cause of a necessitous and compelling nature to quit if the employer requires the claimant to engage in illegal activity or, if not illegal, activity that violates ethical or professional standards. *Share v. Unemployment Comp. Bd. of Review*, 512 A.2d 794, 795 (Pa. Cmwlth. 1986); *Kroepil v. Unemployment Comp. Bd. of Review*, 411 A.2d 1320, 1322 (Pa. Cmwlth. 1980). A claimant need not be subject to such conduct indefinitely. *Porco*, 828 A.2d at 429. When a claimant informs her superiors of conduct that is harassing, humiliating, or abusive, she acts with common sense. *Id.*

22

at 428 (citing *Brown v. Unemployment Comp. Bd. of Review*, 780 A.2d 885, 888-89 (Pa. Cmwlth. 2001)). Whether an employee has a necessitous and compelling reason for voluntarily quitting is a question of law and, therefore, subject to plenary review. *Steinberg Vision Assocs. v. Unemployment Comp. Bd. of Review*, 624 A.2d 237, 239 n.6 (Pa. Cmwlth. 1993).

Here, as the Board concluded, Claimant met her burden of establishing that she was subject to intolerable working conditions that justified her voluntarily quitting her employment. Claimant persistently reported instances of employee misconduct to Employer, such as the delinquent sewage rental fees that Administrative Assistant was neglecting to collect, Administrative Assistant's theft of time, Road Foreman's use of Employer's resources to purchase items for his personal use, and the Road Department's repeated requests for payment of overtime that was unwarranted. Claimant understandably testified that, as Employer's financial administrator, she was concerned about these instances of misconduct and reported them because she feared that she would be in trouble if she did not. (R.R. at 138; FOF ¶ 29.) When Road Foreman and other employees learned that Claimant had reported instances of misconduct, they retaliated against her by harassing her. For example, Road Foreman told Claimant she had "a big mouth" and "should try shutting it once in a while," (R.R. at 57), and that she should "watch it" or she was "going to be looking for [her] eighth job," (*id.* at 58, 133). Road Foreman attempted to scare Claimant into quitting, twice telling her that she should wear a bulletproof vest to work because two former employees were going to shoot up the building. When Claimant reported such comments to Solicitor and the Commissioners, a meeting was held, not only with Road Foreman, but with all the Road Department employees. This led to further retaliation against Claimant, as Road Department

23

employees moved their time clock and refused to deliver documents on behalf of Claimant. Claimant acted with common sense in reporting the ongoing financial misconduct and the harassment that occurred as a result. Employer, however, ineffectively responded to her reports. When faced with reports of financial misconduct, other than ordering an audit of the Sewage Department, Employer took no action. Neither Administrative Assistant nor Road Foreman were disciplined. Instead, Claimant's reports were met with comments such as "that was not good," (*id.* at 134), or that if overtime had been "signed off on," then Claimant should pay it, (*id.* at 139), or that the Chairman "did not want anyone fired," (*id.* at 136).

The lack of response to Claimant's repeated reports of financial malfeasance and harassment came to a culmination with the issue of paying overtime. Despite having confirmed with both Auditor and Solicitor that overtime was not to be paid if an employee took personal, sick, or vacation time during the same week, Road Department employees continued to claim overtime. The Road Commissioner himself pressured Claimant into participating in the payment of unwarranted overtime. When Claimant reported this incident, one Commissioner told her she "should quit because something really bad [wa]s going to happen." (*Id.* at 291.) Claimant was not obliged to continue being pressured to engage in behavior that was unethical or contrary to professional standards, if not illegal. *Tom Tobin Wholesale v. Unemployment Comp. Bd. of Review*, 600 A.2d 680, 683 (Pa. Cmwlth. 1991) (where the claimant had a reasonable belief that he was participating in an illegal activity and that it would negatively affect his professional and personal integrity, of which he informed his employer, he had a necessitous and compelling reason for quitting); *Share*, 512 A.2d at 795 (holding that an accountant had good cause to quit when the employer instructed the employee to make inaccurate accounting entries).

24

While Employer argues that Claimant acknowledged that she did not quit because of Employer's lack of oversight of its finances, Employer points to a single statement Claimant made during her summary at the hearing that it was "not about the finances as to why [she] quit[], it [was] about [Claimant] being harassed and threatened and fear and intimidation." (R.R. at 180.) The Board did not place much weight on this single, unclear statement because the other evidence in the record, including the bulk of Claimant's testimony and her January 22, 2018 email reflected that one of the primary reasons for her quitting at that time was that Employer would not address the problem of other employees, including Road Commissioner, pressuring Claimant to pay overtime that, under the circumstances, would have been unethical or contrary to professional standards, if not illegal. Moreover, as we have set forth, it was Employer's refusal to respond to Claimant's reports of financial malfeasance, the harassment that occurred as a result of her reports, and the pressure placed on Claimant to engage in what was, at the very least, unethical or unprofessional behavior, that constituted the intolerable working conditions.

Employer also makes much of the fact that Claimant refused to attend the September 2017 meeting that was designed to remedy the situation. Claimant testified, however, that she refused to attend this meeting, because she did not want to face retaliation from other employees, as she had when Road Commissioner held a meeting with all of the Road Department about comments Road Foreman had made to Claimant. In fact, neither the Chairman nor another Commissioner attended the meeting. Thus, the meeting was not a serious attempt to rectify the situation, as exhibited by comments both before and after the meeting that the Chairman "did not want anyone fired" and that things were only going to get worse. (*Id.* at 136, 163-64, 166.) *Cf. Gioia v. Unemployment Comp. Bd. of Review*, 661 A.2d 34, 37 (Pa.

Cmwlth. 1995) (noting that the Board found that the employer took steps to correct the situation where the employer held a meeting to discuss what the claimant felt was unjustified criticism of his work as a door builder and suggested a second meeting even after the claimant submitted his resignation letter). Moreover, even after this meeting, Claimant continued to be subject to intolerable working conditions, including from Road Commissioner, the very person who called for the meeting.

Under these circumstances, Claimant was subject to intolerable working conditions, and she acted with ordinary common sense and made reasonable efforts to preserve her employment by reporting the intolerable working conditions to Employer, but Employer did not rectify the situation. As we have noted, Claimant was not required to subject herself indefinitely to such intolerable working conditions. *Porco*, 828 A.2d at 428. Thus, we conclude that the Board correctly determined that under these facts Claimant had a necessitous and compelling reason for terminating her employment with Employer.

### III. Conclusion

For the foregoing reasons, we affirm the Board's Order finding that Claimant was not ineligible for UC benefits under Section 402(b) of the Law because she had a necessitous and compelling reason for quitting her employment.

_____
**RENÉE COHN JUBELIRER,** Judge

26

# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Harmony Township,                      :
                    Petitioner         :
              v.                       :   No. 1019 C.D. 2018
                                       :
Unemployment Compensation              :
Board of Review,                       :
                    Respondent         :

# **O R D E R**

**NOW**, March 4, 2019, the June 26, 2018 Order of the Unemployment Compensation Board of Review, entered in the above-captioned matter, is hereby **AFFIRMED**.

_____
**RENÉE COHN JUBELIRER,** Judge